UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Case No. 4:17-cr-42-TRM-SKL |
| SHANNON BAXTER, | ) | |
| Defendant. | ) | |

## REPORT & RECOMMENDATION

Before the Court is a motion to suppress and memorandum filed by Shannon Baxter ("Defendant") seeking to suppress all evidence resulting from a traffic stop [Docs. 21 & 22].[1] Defendant alleges the stop violated the Fourth Amendment to the United States Constitution and, more specifically, the guidelines set in *Rodriguez v. United States*, 575 U.S. ___, 135 S. Ct. 1609 (2015). Plaintiff United States of America ("the government") filed a response in opposition to the motion [Doc. 24]. An evidentiary hearing on the motion was held on March 1, 2018. After fully considering all of the parties' evidence and argument, I **RECOMMEND** that Defendant's motion to suppress be **DENIED**.

I. **FACTUAL BACKGROUND**

During the evidentiary hearing, the government presented the testimony of Tennessee Highway Patrol ("THP") State Trooper Donnie Clark ("Clark"). Defendant presented the testimony of THP Dispatcher Jessica Partin ("Partin"). The following pertinent facts are

---

[1] By standing order, the motion to suppress was referred for a report and recommendation pursuant to 28 U.S.C. § 636(b).

undisputed and, for the most part, visually (but largely inaudibly) recorded by Clark's dashboard camera,[2] which activated when he turned on his blue lights and captured from a short time period prior to the activation of the blue lights through Defendant's arrest. The tape counter runs from about 2 minutes before Clark first spoke to Defendant until the end of the encounter.

Clark has 24 years of law enforcement experience, including training as a drug interdiction officer conducting traffic stops. Turning to the events at issue, on a cloudy afternoon around 3:00 p.m. on November 7, 2017, Clark initiated a stop of a gray Chevy Malibu ("Malibu") traveling westbound on I-24 in Coffee County, Tennessee after he observed what he thought was a window tint violation coupled with a driver cellphone violation, both Class C misdemeanor traffic violations. As Clark began to catch up to the Malibu, he observed what he thought was a "trailer"

---

[2] The recording is Government's Exhibit 2. Defendant provided the following description of events on the recording:

- 0.00 tape begins
- 0109: Clark is behind Baxter's car
- 0115: blue lights activated, car stops
- 0200: Clark is at passenger window
- 0254: license and registration are handed over
- 0328: Baxter out of car, pockets searched
- 0533: Baxter is detained in front of patrol car
- 0600: Baxter is warned to "stay put"
- 0626: Trooper Clark is back in his patrol car, appears to be checking license
- 0750: feedback is heard from car radio
- 0843: "send canine" is heard
- 1740: Baxter asks if he can smoke
- 1742: Trooper Boles arrives
- 1900: Boles appears to be checking vin number
- 1913: "canine" is mentioned
- 1940: passenger Slater (sic) is pulled out of the car
- 1957: canine arrives
- 2020: canine hits
- 2040: Baxter and Slater (sic) are arrested

[Doc. 22 at Page ID # 40].

2

car pull closely and directly behind the Malibu. Clark thought the trailer car, which had Ohio plates, was attempting to block or deter him from initiating a traffic stop of the Malibu. Clark believed this blocking maneuver was consistent with illegal interstate transportation of narcotics based on his extensive experience and training.

Clark turned on his blinker and wedged behind the Malibu. Clark then activated his blue lights to stop the Malibu, which also activated his dashboard camera. Clark approached the passenger's side of the Malibu and informed Defendant, who was the driver, why the stop was initiated. Defendant told Clark the Malibu belonged to a "lady friend" and provided his driver's license, which indicated he resided in Indiana. The Malibu had an Indiana tag. Clark told Defendant why he was stopped and obtained Defendant's license and registration papers about a minute and a half after the Malibu pulled over. Clark concluded that Defendant was more nervous than typical because Defendant's hands were shaking when he handed Clark his driver's license and registration. Clark also concluded that the sole passenger in the Malibu, Chanel Satter ("Satter"), was more nervous than normal because she avoided making eye contact with Clark.

Clark directed Defendant to exit the Malibu, patted his outside pockets down, and spoke with him in front of the patrol car. Clark asked Defendant why he was texting and driving and Baxter stated that he was looking at a map on his phone. Clark asked Defendant about his travel plans and Defendant responded that he was returning from Atlanta, Georgia after visiting a lady friend and baby for a couple of days.

Next, Clark left Defendant at the front of his patrol car and went to the Malibu to speak with Satter, who was sitting in front passenger seat. In response to Clark's questions about their travel, Satter advised Clark that neither she nor Baxter had visited anyone in Atlanta; instead, she reported they went to Georgia to go shopping. While Clark was speaking with Satter, Defendant

3

yelled at Clark, "Don't tell her about the baby." As he was yelling, Defendant approached Clark in what Clark thought was an aggressive manner.

Clark then returned to his patrol car to review Defendant's documentation. While in his patrol car, Clark made his initial contact with the THP dispatcher about the stop. In this radio communication, Clark requested the THP dispatcher to run the license tag on the Malibu, requested backup, and requested a drug detection canine because he suspected criminal activity based on Defendant's nervousness and aggressive behavior. Clark also began writing a warning ticket for a window tint violation under Tenn. Code Ann. § 55-9-107 and a texting violation under Tenn. Code Ann. § 55-8-199.

As Clark was sitting in the patrol car writing the warning ticket, Defendant, who was still at the front of the patrol car, asked to speak with Clark. As a result, Clark exited his patrol car. Defendant then questioned why he was stopped and accused Clark of "racial profiling." During this communication, Clark asked for permission to search the Malibu and Defendant declined to give consent.

Approximately 11 minutes after the video was activated, Clark finished speaking to Defendant and returned to his patrol car. Clark contacted his dispatcher and submitted Defendant's driver's license information for a license check. Clark also used his cell phone to request a background check on Defendant from a law enforcement service known as the Blue Lighting Operations Center ("BLOC"). Clark would have requested a record check from the BLOC the first time he entered his patrol car, but Defendant interrupted him when Defendant asked to speak with him so Clark was unable to request the BLOC records at that time.

Clark routinely uses both the THP dispatch system and the BLOC for background checks because the BLOC is capable of conducting a more complete record check than THP. Clark

4

testified extensively about the different types of information available from the BLOC and from the THP dispatch system. In summary, the BLOC provides a far more detailed criminal history, a more thorough warrant check, and parole and probation information not available from the THP dispatcher. Clark finds the BLOC information useful in conducting traffic stops and routinely uses the BLOC to obtain information during traffic stops. In Clark's experience, sometimes the BLOC is quicker to return requested background information and sometimes the THP dispatcher is quicker to return requested background information.

Approximately 16 minutes/20 seconds after the video was activated, Clark's backup, THP Trooper Jason Boles ("Boles"), arrives. Boles obtains and reports the Malibu's Vehicle Identification Number ("VIN") to Partin, the THP dispatcher for this incident, because she has determined that she cannot obtain the Indiana tag information without the VIN. Later, Partin learns she is unable to obtain the tag information even with the VIN. Partin eventually had to call the Indiana State Police directly to obtain the tag information. The tag information was not obtained until well after the below referenced canine alert.

Clark testified license tag information is often important to obtain in traffic stops to determine if the driver is in lawful possession of the vehicle. Clark also testified that he routinely seeks license tag information especially when he knows the driver is not the owner of the vehicle as was the case in the instant stop.

About 18 minutes after the video was activated, Coffee County Deputy Jennifer Curbow ("Curbow") arrived with her canine, Max. Approximately 18 minutes/20 seconds after the video was activated, Clark asked Satter to exit the Malibu. About 18 minutes/45 seconds after the video was activated, Curbow deployed Max and within 15 seconds, Max alerted on the Malibu. At the time of Max's alert, the request for background information made to the BLOC and the tag

5

information request to the THP dispatcher were still pending. Clark could not recall when, if ever, he received information back from the THP dispatcher regarding the requested check on Defendant's driver's license.[3]

Based on the canine alert, Clark and Boles searched Defendant and Satter and then began to search the Malibu. Very shortly after the canine alert, Clark received a call on his cellphone from the BLOC reporting that Defendant had no outstanding warrants but had a criminal record, including a recent drug trafficking conviction and a recent charge for robbery.

The Malibu search revealed about five kilograms of methamphetamine packaged in five separate plastic containers in the trunk of the Malibu. This is the evidence Defendant seeks to suppress. Defendant and Satter were placed under arrest. After the search was completed, Clark finished the warning ticket with a noted time of 3:38 p.m. and gave it to Defendant.

Clark agreed that it typically takes him about 10 minutes to conduct a routine traffic stop and about three additional minutes/30 seconds to write a routine citation.

On November 28, 2017, Defendant was indicted for possession with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§841(a)(1) and 841(b)(1)(A) [Doc. 1].

## II.    ANALYSIS

Although not entirely clear in Defendant's original motion and memorandum, Defendant clarified at the hearing that he alleges the search of the Malibu was unconstitutional because law enforcement unreasonably extended his uncompleted traffic stop by requesting a records check

---

[3] In the briefing, the government acknowledged it is possible Clark received information back from the THP dispatcher regarding the status of Defendant's driver's license prior to Max's alert on the vehicle [Doc. 24 at Page ID # 47, n.3].

6

from the BLOC. It is essentially undisputed that Clark first requested a records check from the BLOC about seven or eight minutes into the stop, and that it took the BLOC about 10 minutes more to respond with the requested information. Defendant argues a constitutional violation occurred under the reasoning of *Rodriguez* because the THP dispatcher may have returned some information from her records check to Clark before the canine unit arrived and, under Defendant's theory, the stop should have been completed prior to the arrival of the canine unit. As pertinent, the government contends the stop was not completed until after the BLOC returned the requested information and the warning citation was completed, by which time the canine had alerted on the Malibu providing probable cause for the ensuing search.

### A. Standards

The cornerstone of Defendant's argument is the Fourth Amendment, which provides, "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV.[4] Stopping and detaining a motorist is a seizure—a non-consensual, investigative detention—within the meaning of the Fourth Amendment, analyzed under the framework of *Terry v. Ohio*, 392 U.S. 1(1968). *See United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (citations omitted). While law enforcement may stop a vehicle for any traffic infraction, detention beyond the scope of the initial stop requires reasonable suspicion of criminal activity. *United States v. Davis*, 430 F.3d 345, 353 (6th Cir. 2005) (citations omitted). "[W]ithout such reasonable suspicion, all the officer's actions must be 'reasonably related in scope to circumstances justifying the original interference.'"

---

[4] A defendant has the burden of establishing a legitimate expectation of privacy to assert a Fourth Amendment right. *United States v. Smith*, 263 F.3d 571, 582 (6th Cir. 2001). As a preliminary matter, the government does not contest that Defendant had a legitimate expectation of privacy with respect to the stop.

7

*United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) (quoting *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999)).

Defendant, as the proponent of the motion to suppress, generally bears the burden of establishing his Fourth Amendment rights were violated, *see Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978), but it is the government's burden to demonstrate by a preponderance of the evidence that the stop and the warrantless search were proper under the Fourth Amendment, *see United States v. Winfrey*, 915 F.2d 212, 216 (6th Cir. 1990) (citation omitted); *see also United States v. Haynes*, 301 F.3d 669, 677 (6th Cir. 2002). If either the initial traffic stop or the scope and duration of the stop was unlawful, then the evidence obtained from that illegality may be excluded. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963); *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citations omitted).

### B. The Scope and Duration of the Stop Were Reasonable

Defendant has not challenged the constitutionality of the initial traffic stop or canine sniff. As a result, it is accepted that Clark had probable cause to stop the Malibu based on his reasonable belief of tint and texting violations under Tennessee law. Moreover, it is accepted that the canine sniff was proper and provided ample probable cause for the ensuing search.[5] Defendant does challenge the scope and duration of the stop and alleges Clark violated the Fourth Amendment's

---

[5] Normally, "a dog sniff does not require separate reasonable suspicion because it is not a search under the Fourth Amendment. *Stepp*, 680 F.3d at 663 (citing *Illinois v. Caballes*, 543 U.S. 405, 409 (2005)); *Bell*, 555 F.3d at 541-42 (a slight deviation from the initial purpose of traffic stop to call for and deploy a drug-detection dog around vehicle would not require separate reasonable suspicion) (citations omitted). If the dog sniff was conducted while a suspect was properly seized as a result of a lawful traffic stop, "the dog sniff may render an otherwise lawful seizure unlawful only if it unreasonably prolongs the initial stop and the officer lacked an independent reasonable suspicion to extend the stop." *Stepp*, 680 F.3d at 663 (citations omitted). As the canine unit arrived prior to the completion of the stop in this case, deploying the canine did not prolong the stop.

8

prohibition against unreasonable searches and seizures.

Although not specifically articulated this way by Defendant, his motion to suppress raises two issues: (1) was the purpose of the traffic stop completed prior to the deployment of the canine; and, if not, (2) was the yet-to-be-completed traffic stop unreasonably and measurably extended beyond the time necessary to conclude the stop. While stated separately, these are intertwined issues and they will be addressed together.

As the Supreme Court has held,

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquiries into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.

*Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (internal citations omitted). It is well known that "an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'" *United States v. Campbell*, 511 F. App'x 424, 428 (6th Cir. 2013) (quoting *United States v. Wellman*, 185 F.3d 651, 656 (6th Cir. 1999)) (other citations omitted).

Defendant clarified at the hearing that he was not contending that the stop was *actually* completed prior to the canine's alert as Clark had not yet written or given Defendant a ticket or warning for the traffic violations or returned Defendant's driver's license and registration papers to him. Thus, the purpose of the traffic stop was not completed prior to the deployment of the canine. Nevertheless, Defendant contends the reason the stop was not completed was that Clark

9

unreasonably extended the minor traffic infraction stop by requesting information from the BLOC and a canine unit.   Accordingly, the relevant and dispositive inquiry for this Court is whether law enforcement unreasonably prolonged the not-yet-completed stop.

No doubt, law enforcement officers may not unreasonably prolong an otherwise lawful stop without running afoul of the Fourth Amendment.   *See, e.g., Stepp*, 680 F.3d at 661-62 (citing *United States v. Everett*, 601 F.3d 484, 492 n.9 (6th Cir. 2010)) (holding that, to curb potential abuse because "a crafty officer . . . may simply delay writing a ticket for the initial traffic violation until after she has satisfied herself that all of her hunches were unfounded, [courts] also treat the unreasonable extension of a not-yet-completed traffic stop as a seizure.").   As often reiterated by the Sixth Circuit,

> A valid *Terry* stop must be "limited in scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983); *see also United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010).   To be limited in scope, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time."   *Royer*, 460 U.S. at 500.   To be limited in duration, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."   *Id*.

*E.g., United States v. Cochrane*, 702 F.3d 334, 340 (6th Cir. 2012).

While the parties may be off a few seconds in their respective positons about the timing of events, it is largely undisputed that Defendant is removed from the Malibu about two or three minutes after he stops; Defendant and Satter are then separately questioned for several minutes; a background check, backup, and a canine unit are requested; Clark and Defendant talk again; the BLOC background check is requested; and the canine alerts about 18 or 19 minutes after Defendant is stopped before the BLOC information is returned.   Defendant focused his argument on the claim that his traffic stop should have been concluded in about 13 minutes, the time of Clark's

10

average traffic stop, which would have ended the stop before the canine unit arrived. Defendant argues that Clark unreasonably extended the not-yet-completed stop by requesting the records check from the BLOC. As pertinent, the government contends that Clark did not unreasonably prolong the not-yet-completed stop as the canine unit was properly deployed while Clark was still reasonably awaiting information requested from the BLOC in order to complete the traffic stop.

"[T]he proper inquiry is whether the 'totality of the circumstances surrounding the stop' indicates that the duration of *the stop as a whole*–including any prolongation due to suspicionless unrelated questioning–was reasonable." *Everett*, 601 F.3d at 494 (emphasis in original) (internal citations omitted).[6] The overarching inquiry is one of reasonableness. *Id.* at 493-94. To evaluate the reasonableness of a stop, a court considers the diligence of the officer. *Id.* at 494. A court "must conduct a fact-bound, context-dependent inquiry in each case" to determine whether the "'totality of the circumstances surrounding the stop' indicates that the duration of the stop as a whole. . . including any prolongation due to suspicionless unrelated questioning—was reasonable." *Id.* (citations omitted). An officer's "subjective intent or hope to uncover unrelated criminal conduct," however, "is irrelevant." *Id.* at 495 n. 12 (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). The key inquiry is "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *Id.* at 494 (quoting *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

As expressly stated during the hearing, the only action by Clark that Defendant raises as

---

[6] "An officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Everett*, 601 F.3d at 490 (quoting *Johnson*, 555 U.S. at 333). In this case, Defendant expressly acknowledged during the hearing that there was no prolonged or unreasonable questioning by Clark.

11

unreasonably prolonging the stop is Clark's request for background information from the BLOC. Defendant objects to the length of the stop because he was detained from when the THP dispatcher may have reported Defendant's driver's license information back to Clark until the canine arrived and alerted on the Malibu. He argues that if Clark had issued the warning citations immediately when the THP dispatcher may have reported his driver's license was valid, the stop would have been completed before the canine unit arrived.[7]

Defendant's argument fails, however, because Clark did not unreasonably extend the traffic stop by requesting a records check from the BLOC under the totality of the circumstances. Indisputably, an officer may lawfully detain a driver such as Defendant during a routine traffic stop in order to conduct records checks. *See United States v. Smith*, 601 F.3d 530, 542 (6th Cir. 2010) (holding it is appropriate for a police officer to conduct records check on both a driver and passenger to determine if they have valid identification or have outstanding warrants during a traffic stop); *Hill*, 195 F.3d at 269 (holding a driver's license check is within the original scope of a stop for a traffic violation); *United States v. Swallows*, No. 1:12-CR-148, 2013 WL 5773261, at *3 n.1 (E.D. Tenn. Oct. 24, 2013) (citations omitted) ("It should be noted that as a matter of course officers are permitted to carry out license checks during traffic stops, and, if conducted reasonably, such activity does not impermissibly extend a stop.").

Also without a doubt, an officer may conduct a reasonable records check through information systems such as the BLOC without violating the Fourth Amendment. *See e.g., Campbell*, 511 F. App'x at 427-28 (noting a stop was "diligently pursued" until the BLOC returned

---

[7] For purposes of addressing this argument, I will assume, without deciding, that the THP dispatcher did report that Defendant had a valid driver's license at the time suggested by Defendant.

12

the officer's call with information and holding "an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity 'would be well within the bounds of the initial stop.'") (citations omitted)); *United States v. Urietta*, 520 F.3d 569, 572-74 (6th Cir. 2008) (holding the end of a traffic stop to be three minutes after the El Paso Intelligence Center, which provides information on drivers' licenses, car registrations, and whether an individual has crossed the border at a checkpoint, was deported, or is under federal investigation, returned the officer's call); *United States v. Chin*, No. 1:13-CR-91, 2014 WL 2009054, at *2 (E.D. Tenn. May 16, 2014) (citations omitted) (holding police officer may run record checks through systems such as the EPIC or BLOC without violating the rule against unreasonably extending the duration of traffic stop).

I **FIND** that Clark's action in seeking information from the BLOC was the sort of diligent police work the Sixth Circuit has found to be reasonable. Defendant's argument that Clark received Defendant's driver's license information from the THP dispatch around the seven or eight minute mark does not render waiting for the BLOC report (or the Indiana license tag information) unreasonable. Clark credibly testified that getting the driver's license information back from the THP dispatcher, if he did, was not the end of his records check and did not provide all of the background information he needed for this traffic stop. While Defendant objects to Clark requesting information from the BLOC, the Sixth Circuit has held such requests do not unreasonably prolong a traffic stop. *See Campbell*, 511 F. App'x at 427-28; *Urietta*, 520 F.3d at 572-74. The evidence overwhelmingly demonstrates that Clark properly sought information from the THP dispatcher and from the BLOC and then reasonably waited a reasonable amount of time for the requested information from the BLOC prior to concluding the traffic stop. Accordingly, under the totality of the circumstances, I **FIND** that Clark's actions were diligent,

13

reasonable, and proper and they did not unreasonably or unconstitutionally prolong the not-yet-completed stop. *See Carter v. Hamaoui*, 699 F. App'x 519, 532 (6th Cir. 2017) (finding no evidence an officer prolonged a stop to allow for a dog sniff where the officer "patted down [the defendant] and put him in the police car and began putting [the defendant's] possessions in a bag when [the dog] alerted," as another officer escorted the dog around the truck).

Defendant's reliance on *Rodriguez* as "controlling" authority [Doc. 22 at Page ID # 40] to argue Clark unreasonably prolonged the stop—thus, rendering it unconstitutional—is misplaced. In *Rodriguez*, the Supreme Court held that, absent reasonable suspicion, a law enforcement officer violate the Fourth Amendment if a traffic stop is prolonged—even for as little as seven to eight minutes—solely to conduct a dog sniff. 135 S. Ct. at 1612-13, 1616-17. That a traffic stop may last no longer than necessary to achieve its purpose is not a new proposition in the Sixth Circuit. *See, e.g., Urrieta*, 520 F.3d at 574 (holding that "[t]o detain a motorist any longer than is reasonably necessary to issue a traffic citation, an officer must have a reasonable suspicion that the individual has engaged in more extensive criminal conduct." (citation omitted)); *Townsend,* 305 F.3d at 541 (same). Even prior to *Rodriguez*, the Sixth Circuit "adopted a bright-line rule that any subsequent prolonging, even *de minimis,* is an unreasonable extension of an otherwise lawful stop." *Stepp,* 680 F.3d at 661-62 (citation omitted).

What *Rodriguez* may clarify is a "limitation on extending a not yet completed traffic stop, where the reasonableness standard—in which *de minimus* extensions are not unreasonable—governs." *United States v. Hendrix*, 143 F. Supp. 3d 724, 726-27 (M.D. Tenn. 2015) (citing *United States v. Zuniga,* 613 F. App'x 501, 502 n.1 (6th Cir. 2015) (quoting *Stepp,* 680 F.3d at 661-62)) (internal quotation marks omitted)). Essentially, the Supreme Court endorsed precluding even a *de minimus* extension of a concluded stop and held: "a traffic stop prolonged

14

beyond [the time reasonably required to complete the stop's mission] is unlawful. The critical question, then, is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff 'prolongs'—i.e., adds time to—'the stop.'"  *Rodriguez*, 135 S. Ct. at 1616 (citation omitted).   Similarly, the Sixth Circuit has long held that "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."   *Hill,* 195 F.3d at 264.

In arguing for the application of *Rodriguez*, Defendant fails to acknowledge the meaningful, factual distinctions between his detention and that described in *Rodriguez*.  For instance, unlike in *Rodriguez* where the officers extended the traffic stop—without any individualized suspicion—after all tasks tied to the traffic infraction had been completed and refused to allow Rodriguez to leave, 135 S. Ct. at 1613-14, 1616, the stop in this case was neither completed nor unreasonably prolonged.

Once the drug dog alerted on the Malibu, law enforcement had probable cause to search it. *United States v. Torres-Ramos*, 536 F.3d 542, 554 (6th Cir. 2008) ("[A] positive indication by a properly trained dog is sufficient to establish probable cause for the presence of a controlled substance.") (citing *United States v. Diaz,* 25 F.3d 392, 393-94 (6th Cir. 1994)).   Defendant has not contended otherwise.

I will now directly address Clark's credibility.   Questioning and responses during Clark's testimony included some imprecise use of the singular term "license" to refer to Defendant's driver's license and/or to the Malibu's license tag.   However, I **FIND** that Clark's experience, appearance, demeanor, descriptive account of the day's events, corroborated testimony, and overall impression support finding that he gave very credible testimony.   The video recording of

15

the stop, which fully supports Clark's testimony, bolsters this finding.

A court is given wide latitude in making its credibility determinations. *United States v. Haynes*, 301 F.3d 669, 679 (6th Cir. 2002) (citation omitted). "In assessing credibility, a court considers numerous factors, ultimately relying on the common sense tests of reason and logic." *United States v. Caldwell*, No. 1:13-CR-128, 2015 WL 179583, at *9 (E.D. Tenn. Jan. 14, 2015) (attached report and recommendation by Lee, MJ) (citing *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005)). Contrary to Defendant's argument, the testimony of Partin and Clark was credible and does not suggest any unreasonable prolongation of the stop. *See United States v. Garrido,* 467 F.3d 971, 979 (6th Cir. 2006) (holding courts may conclude that the "consistency of the two officers' accounts" indicates that their statements are credible); *see also United States v. Simmons,* 174 F. App'x 913, 917 (6th Cir. 2006) (finding officers' testimony credible because it was substantively consistent); *United States v. Hedelsky*, No. 4:15-CR-13-TRM-SKL, 2016 WL 1714224, at *4 (E.D. Tenn. Apr. 6, 2016), *report and recommendation adopted,* No. 4:15-CR-13, 2016 WL 1706147 (E.D. Tenn. Apr. 28, 2016) (same).

Accordingly, I **CONCLUDE** the government has met its burden to show, by a preponderance of the evidence, that the warrantless search was proper under the Fourth Amendment in that Defendant was properly seized for a lawful traffic stop that was not unreasonably prolonged prior to the canine alert. As the stop was neither completed nor unreasonably prolonged beyond what was permissible when the canine alerted, the Court need not address the government's alternative arguments concerning (1) any development of reasonable suspicion during the stop prior to the alert or (2) any application of a "good faith" doctrine in the event of a Fourth Amendment violation.

Accordingly, I **RECOMMEND** that Defendant's motion to suppress be **DENIED.**

## III. CONCLUSION

For the reasons stated above, I **RECOMMEND**[8] that Defendant's motion to suppress [Doc. 21] be **DENIED** in its entirety.

                                              s/ *Susan K. Lee*
                                              SUSAN K. LEE
                                              UNITED STATES MAGISTRATE JUDGE

---

[8] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 59(b) of the Federal Rules of Criminal Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).